**FILED**

JAN 0 5 2009

**U.S. DISTRICT COURT
CLARKSBURG, WV 26301**

DIANA F. OGDEN,
      Plaintiff,

v.                           Civil Action No. 2:08CV4
                                     (Judge Maxwell)

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"),

42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for

Summary Judgment and Defendant's Motion for Summary Judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.  Procedural History

Diana F. Ogden ("Plaintiff") filed a prior application for disability insurance benefits ("DIB")

on October 8, 2002, alleging disability since July 31, 2002, due to pancreatitis, chest pain, eight leg

surgeries, Type II diabetes, asthma, acid reflux, hiatal hernia, high blood pressure, and irritable bowel

syndrome (R. 58-74). This claim was denied at the Initial and Reconsideration levels (R. 5-53). An

administrative law judge ("ALJ") held a hearing and rendered a decision on October 23, 2003,

denying Plaintiff's claim (R. 396-406). Plaintiff filed a Complaint in this Court. On January 9,

2006, United States Magistrate Judge James E. Seibert entered a Report and

Recommendation/Opinion recommending the Commissioner's decision be affirmed. On February

10, 2006, United States District Judge Robert E. Maxwell entered an Order affirming Magistrate Judge Seibert's Report and Recommendation and denying Plaintiff's Motion for Summary Judgment (R. 410).

Plaintiff filed the present application for DIB on March 16, 2004, alleging disability onset of August 1, 2002, due to "bad pancreas," diabetes, acid reflux, hiatal hernia, asthma, high blood pressure, liver problems, sleep disorder, "need both knees replaced," and diabetic neuropathy (R. 432, 454). This claim was denied at the initial and reconsideration levels and a hearing was timely requested (R. 407, 408). Administrative Law Judge Donald T. McDougall ("ALJ") held a hearing on February 27, 2006 (R. 658). Claimant, represented by counsel, appeared and testified, as did Vocational Expert Larry Bell ("VE"). The ALJ issued a decision denying benefits on April 17, 2006 (R. 364-380). Plaintiff appealed the decision to the Appeals Council, submitting additional evidence (R. 358). On November 7, 2007, the Appeals Council denied Plaintiff's request for review (R. 355), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Diana F. Ogden ("Plaintiff") was born on December 14, 1951, and was four months shy of 55 years old at the time of the ALJ's decision (R. 432). She obtained a GED and had two years of beauty college and past relevant work as a clerk in the Randolph County Assessor's Office from 1988 -1996, and then as a self-employed owner/manager of a small Christian bookstore from 1998 until July 2002 (R. 455). Plaintiff's earnings record indicates she acquired sufficient quarters of coverage to remain insured through December 31, 2005 (R. 364). She therefore must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. See 42 U.S.C. §423(a),(c). Further, because Plaintiff's previous claim

adjudicated the period from October 8, 2002, through the date of the decision on October 23, 2003,

that previously adjudicated period is not considered, as *res judicata*, and this Report and

Recommendation adjudicates only the period from October 24, 2003 through December 31, 2005,

her date last insured.[1]

---

[1]Because the period from July 31, 2002, through October 23, 2003, has already been ultimately adjudicated, the undersigned does not re-hash the facts from that time period, except where it may provide background for the present claim. The undersigned notes that Magistrate Judge Seibert's prior Report and Recommendation contains a recital of Plaintiff's medical history from that time period as follows: (See 2:04CV67).The following medical history is relevant to the time period during which the ALJ
concluded that Claimant was not under a disability: July 31, 2002–October 23, 2003.
**Davis Memorial Hospital, Discharge Summary, 11/14/2002, Tr. 122**
DISCHARGE DIAGNOSIS: 1. Musculoskeletal chest pain.
2. Nausea and vomiting, reflux.
3. Morbid obesity.
4. Diabetes mellitus, uncomplicated but uncontrolled of nw
onset.
5. Hyperlipidemia.
6. Rib pain.
**Davis Memorial Hospital, History and Physical, 10/3/2002, Tr. 125**
ADMITTING IMPRESSION: 1. Acute chest pain.
2. Abdominal discomfort.
3. New onset diabetes mellitus–glucose 305.
**CT Abdomen, 10/04/2002, Tr. 128**
IMPRESSION: There is fatty infiltration of the liver but I see no other significant abnormality.
**NUC 7071-SPECT-CARDIAC (CARDIOLITE), NUC 7141-ADENOSITE INJ., 6 mg,10/03/2002, Tr. 129**
IMPRESSION: No evidence of ischemia.
**Radiology Study, Chest, 10/02/2002, Tr. 130**
IMPRESSION: Negative
**Dr. Kip Beard, 12/22/2002, Tr. 155-160**
IMPRESSION: 1. Diabetes mellitus, type II.
2. Chest pain, atypical for angina.
3. Hypertension.
4. Asthma.
5. Status post bilateral knee surgery.
A. Osteoarthritis.
6. Exogenous obesity.

7. History of pancreatitis.
8. Irritable bowel syndrome.
9. Gastroesophageal reflux disease.
10. Recurrent kidney stones status post lithotripsy and stent placement.

**Dr. Hugh M. Brown, Physical Residual Functional Capacity Assessment, 12/31/2002, Tr. 161-168**

EXERTIONAL LIMITATIONS:
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;
Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
Sit for a total of, about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.
POSTURAL LIMITATIONS:
"None established" in all categories.
MANIPULATIVE LIMITATIONS:
"None established" in all categories.
VISUAL LIMITATIONS:
"None established" in all categories.
COMMUNICATIVE LIMITATIONS:
"None established" in all categories.
ENVIRONMENTAL LIMITATIONS:
"None established" in all categories.
SYMPTOMS:
Considering degree of subjective pain, and in view of the objective findings, degree of obesity, ROM of knee, normal gain–RFC reduced to light.

**Dr. Thomas Lauderman, Physical Residual Functional Capacity Assessment, 3/10/2003, Tr. 169-176**

EXERTIONAL LIMITATIONS:
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;
Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
Si for a total of, about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.
POSTURAL LIMITATIONS:
Climbing, balancing, stooping, kneeling, crouching, crawling, occasionally.
MANIPULATIVE LIMITATIONS:
"None established" in all categories.
VISUAL LIMITATIONS:
"None established" in all categories.
COMMUNICATIVE LIMITATIONS:
"None established" in all categories.

4

ENVIRONMENTAL LIMITATIONS:
"None established" in all categories.
SYMPTOMS:
Client has some decrease in AOL's; SOB however lung (unintelligible); takes Albuterol
for asthma.
**Dr. Khan, Physician's Physical Capacities Evaluation, 2/20/2003, Tr. 179-181**
I. In an 8-hour workday:
sit, 2 hours
stand/walk, 2 hours
sit for 20 minutes at a time without needing to change position
stand for 1 hour at a time without needing to change position
Limitations due to pain, fatigue, shortness of breath–pain due to surgeries; shortness of breath
asthma;
diabetes-fatigue.
Will need the flexibility to change position, frequently
II. Claimant can lift, 11-20 lbs., occasionally
Limitation dues to pain with legs and SOB
III. Claimant can carry, 21-50 lbs., occasionally
Limitation due to SOB and leg pain
IV. Limitations due to arthritis:
Right and left: Pushing and Pulling, simple grasping, fine manipulation
V. Limitation due to multiple surgery on legs/arthritis, both feet
VI.. Claimant is able:
A. Bend, occasionally.
B. Squat, not at all.
C. Crawl, occasionally.
E. Reach Above, frequently.
F. Stoop, occasionally.
G. Kneel, occasionally.
Limitation due to multiple surgeries on legs/arthritis.
VII. Claimant can tolerate:
A. Exposure to unprotected heights, not at all.
B. Being around moving machinery, occasionally
C. Exposure to marked changes in temperature, frequently.
D. Driving automotive equipment, frequently.
E. Exposure to dust, fumes, gases, smoke, and perfumes, occasionally.
F. Exposure to noise, occasionally.
G. Chemical, not al all.
H. Jumping, not at all.
Limitations due to asthma and allergies.
VIII. Objective signs of pain: post surgical syndrome/adhesions; muscle spasm; arthritis changes;

5

tenderness to palpation; limitations of motion, OA both knees; CBP; l/p/ spine OA.
IX. Degree of pain reasonably related to the underlying condition, moderate.
X. Pain is chronic.
XI. Claimant will need unscheduled interruptions of work routine, frequently
XII. Claimant will probably miss work due to exacerbation of pain, frequently.
XIII. Claimant is unreliable.

**Dr. Khan, 10/17/2002, Tr. 194**
Diet is right; diabetes mellitus, type II, uncontrolled; exercise.

**Dr. Khan, 9/20/2002, Tr. 195**
Pain, abdomen; obesity, weight gain; dyspnea.

**Dr. Khan, 10/23/2002, Tr. 197**
Diabetes Mellitus, type II; in depth control, sugars improving.

**Dr. Khan, 11/4/2002, Tr. 198**
DM, type II, insulin dependent.

**Dr. Khan, 12/23/2002, Tr. 199**
DM, type II, uncontrolled; exercise program.

**Dr. Khan, 12/18/2002, Tr. 200**
DM, type II.

**Dr. Khan, 12/20/2002, Tr. 201**
DM, type II, uncontrolled; improving control.

**Dr. Khan, 1/8/2003, Tr. 204**
DM, type II, reasonable control.

**Davis Memorial Hospital, CT Abdomen, 2/17/2003, Tr. 209**
IMPRESSION: Unremarkable study.

**Dr. Khan, 2/28/2003, Tr. 210**
Abd. pain, DM, type II, diarrhea, [unintelligible].

**Dr. Khan, 5/29/2003, Tr. 211**
Dyspnia, bronchitis, htn, [unintelligible].

**Dr. Kahn, 5/15/2003, Tr. 213**
[Unintelligible] edema.

**Davis Memorial Hospital, Sinuses, Paranasal, 5/15/2003, Tr, 214**
IMPRESSION: Normal sinus exam.

**Dr. Khan, 5/9/2003, Tr. 215**
Renal calculi, HTN, DM, type II, edema, [unintelligible].

**Dr. Khan, Tr. 216**
HTN; DM, type II; obesity; [unintelligible]; no decrease sugars spd.

**Dr. Syed N. Haq, 12/8/2003, Tr. 313**
History: hypertension, gastritis, pancreatitis, uncontrolled type II diabetes, elevated AST and LT levels.

On November 14, 2003, Plaintiff saw her doctor, Farukh Khan, M.D., for follow up (R. 539). He diagnosed Type II diabetes, uncontrolled.

On December 8, 2003, Dr. Syed N. Haq, a specialist in diabetes/endocrine disorders, wrote to Dr. Khan regarding Plaintiff's diabetes (R. 497). He stated that Plaintiff was morbidly obese with uncontrolled Type II diabetes. He also noted a history of hypertension, gastritis and pancreatitis, and a history of elevated AST and LT levels which he suspected were due to fatty liver caused by uncontrolled diabetes, and which precluded the use of a TZD. She was also not a candidate for Glucophage due to liver dysfunction. Dr. Haq concluded she needed insulin therapy. Dr. Haq noted he also suspected Plaintiff had sleep apnea and recommended an evaluation for that.

On December 15, 2003, Dr. Khan diagnosed Plaintiff with Type II diabetes, hypertension, and peripheral neuropathy (R. 538).

On January 8, 2004, Dr. Khan noted Plaintiff had fatigue, exhaustion, dizziness, and lightheadedness. He diagnosed sleep apnea (R. 537).

On February 9, 2004, Plaintiff presented to the emergency room for cough, congestion, and wheezing (R. 500- 505). Chest x-rays were negative (R. 505). She was released the same day with a diagnosis of acute bronchitis, acute sinusitis, asthma, and hyperglycemia. There was no sign of pneumonia.

On March 4, 2004, Plaintiff complained of not being able to walk at times. Dr. Khan diagnosed peripheral neuropathy due to diabetes (R. 536). He also diagnosed sinusitis and bronchitis.

A mammogram on March 4, 2004, showed evidence of dominant mass, but no evidence of neoplasm (R. 506). The final assessment was negative with only routine follow-up recommended.

On March 8, 2004, Richard E. Topping, M.D. examined Plaintiff (R. 513). He noted her multiple right knee surgeries, including what he believed sounded like a meniscectomy and ACL reconstruction, and a meniscectomy of the left knee. Plaintiff complained of pain which limited her ambulation ability. She did not use any assistive device except a shopping cart at the store. She said she had difficulty even getting to the back of WalMart, had extreme difficulty with stairs, and had bilateral hip pain and some numbness in the right leg.

Upon examination, Plaintiff had a positive Tinel over the median nerve on the right wrist. Her left knee range of motion was from 0-110. She had 2+ valgus instability on the right with firm end point, 1+ anterior drawer, negative Lachman, medial joint line tenderness, but no varus instability. Her right knee ranged from 0-90. She had no gross instability and no obvious deformity, 1+ posterior tib pulsation, intact proprioception distally. She had tenderness over both greater troch regions but no tenderness with gentle ROM of the hip.

X-rays showed a screw in the proximal tibia, a fixation device in the medial femoral condyle, and medial joint space narrowing bilaterally with varus alignment. The pelvis appeared to be normal. Dr. Topping diagnosed bilateral trochanteric bursitis with osteoarthritis of both knees. He counseled Plaintiff on the benefits of weight loss, even explaining the option of referring her for gastric stapling. He noted she had had only conservative treatment in the past with no relief, and suggested a series of injections. He believed a good result would be six months to a year of improvement. If the injections did not work he would consider the option of knee replacement, but explained that at Plaintiff's age and weight there was an extreme likelihood of decreased results, increased risks, and multiple revisions.

Dr. Topping also noted some carpal tunnel of the right wrist. He recommended stretching

and exercise, with cortisone injection if that did not work.

On March 15, 2004, Dr. Domingo Chua, M.D., wrote a letter to the ALJ regarding the ALJ's earlier decision (R. 568). In the letter he explained that he believed part of the ALJ's decision to deny Plaintiff's disability were records from her hospital admission in September 2001, stating that she smoked. However, Plaintiff denied being a smoker and Dr. Chua believed that Plaintiff was actually a non-smoker.

On March 18, 2004, Plaintiff presented to Dr. Topping with continuing problems with her right knee (R. 512). She said the left knee was beginning to hurt because of her increasing weight-bearing on that knee. She brought a hinged knee brace to see if it could be modified. Upon examination her right knee had no erythema, warmth or effusion. Dr. Topping gave her an injection.

That same date, Plaintiff presented to Dr. Khan for follow up (R. 535). Dr. Khan diagnosed bronchitis, sinusitis, and osteoarthritis of both knees. He noted Plaintiff needed knee replacement.

One week later, Plaintiff presented to Dr. Topping for a second injection of her right knee (R. 511). She reported an increased amount of pain in the knee along with giving way. On exam there was no erythema, warmth or effusion.

On March 31, 2004, Plaintiff presented to Dr. Topping for her third injection (R. 510). She said she noticed a significant improvement in pain. The knee still gave way, but the rest of her symptoms had almost completely resolved. On examination, there was no erythema, warmth or effusion.

On April 8, 2004, Plaintiff presented to Dr. Topping for her fourth injection (R. 509). Her knee continued to give way, but she noticed improvement in the pain. On examination, there was no erythema, warmth or effusion.

One week later, Plaintiff had her fifth injection to the right knee (R. 508). She continued with stiffness and giving way, but noticed improvement in pain. She continued to wear her stabilizing brace. There was no erythema, warmth or effusion.

On April 19, 2004, Plaintiff presented to Dr. Khan for a follow up (R. 534). Dr. Khan diagnosed contact dermatitis and uncontrolled diabetes.

On May 11, 2004, Kip Beard, M.D. examined Plaintiff for the State Disability Determination Service (R. 514). Dr. Beard had also examined Plaintiff in 2002, for the same agency. He noted she had been hospitalized with her initial diabetes diagnosis around that time, but had not been hospitalized since. Her blood sugar was running in the 180's. She had nocturia two or three times per night. She had an eye exam in 2003, with no retinopathy. She complained of her feet stinging, burning, and tingling, and said she was told she had diabetic neuropathy. She was prescribed nitroglycerin for a squeezing in the chest that occurred once or twice a month, lasting minutes at a time, worse when she was upset or stressed. She had used the nitroglycerin the previous week and said it helped.

Plaintiff complained of headaches when her blood pressure was up. She had not required hospitalization for this. She never had any diabetic foot ulcers and was not aware of any peripheral vascular disease. She complained of dyspnea on exertion at about 50 yards. She had a non-productive cough and wheeze. She said she used an inhaler three times a day and a nebulizer daily between January and April. Smoke, perfume, gas fumes, and strong odors could trigger her asthma.

Plaintiff was last hospitalized with pancreatitis in 2001 or 2002. She complained of intermittent abdominal pain every couple of days, described as "you can feel it" associated with some nausea.

Plaintiff said she had irritable bowel syndrome primarily causing diarrhea. She had some fecal urgency and significant lower abdominal discomfort. She had chronic heartburn and reflux but Nexium controlled these symptoms. Plaintiff reported no urinary urgency, frequency, dysuria or hesitancy.

Upon examination Plaintiff was 5'4" tall, and weighed 266 pounds (R. 516). Her blood pressure was 130/80. Dr. Beard described her as moderately to severely obese. She was wearing a right knee brace, but could ambulate without it. She ambulated with a right antalgic limp related to knee pain. She could stand unassisted but had difficulty arising from a seat and stepping up and down from the examination table related to knee pain. She seemed comfortable seated and mildly uncomfortable supine.

Plaintiff's lungs were clear to auscultation and percussion, without wheezes, rales or rhonchi, prolonged expiratory phase, accessory muscle recruitment or tenderness to palpation. Breath sounds were symmetrical. The heart had regular rate and rhythm with no murmur, gallop or rub. Her abdomen was mildly tender with no rebound, guarding or rigidity.

Dr. Beard noted "some trace lower extremity edema without variscosities or statis changes." Distal pulses were normal and palpable. There were no femoral bruits, no clubbing and no cyanosis. The cervical spine appeared normal. Shoulders revealed some acromioclavicular crepitation. Range of motion was normal, with no tenderness, redness, warmth or swelling in the shoulders, elbows or wrists. Elbows and wrist motion were normal. There was no tenderness, redness warmth or swelling of the hands, and there was full range of motion in all finger joints, with no atrophy and no Heberden or Bouchard nodes. She was able to pick up buttons and write without difficulty.

Examination of Plaintiff's knees revealed "some moderate bilateral knee crepitations" and

tenderness bilaterally. There was no appreciable redness, warmth, swelling or effusion. Flexion of the right knee was 90 degrees and extension was limited to 20 degrees. Left flexion was 100 degrees and extension 15 degrees. The feet and ankles were non-tender with no redness, warmth or swelling. Flexion of the ankles was normal.

The lumbar spine was normal, with no pain, tenderness or spasm. Plaintiff had difficulty standing on one leg due to knee pain. Straight leg raising was 90 degrees with no complaints. Plaintiff had mildly positive bilateral Tinel's of the wrists, with no sensory loss, no weakness, and no appreciable atrophy. Plaintiff had some difficulty heel walking, toe walking, and tandem walking with knee pain. She could squat about two thirds of the way down, but had difficulty arising due to knee pain.

Dr. Beard's impression was as follows:

1. Diabetes mellitus, type 2

2. Chest pain, atypical of angina, consider relationship to stress or anxiety

3. Hypertension

4. Asthma

5. Osteoarthritis of both knees, status post multiple bilateral knee surgery

6. History of possible gall stone pancreatitis, stable

7. Irritable bowel syndrome

8. Gastroesophageal reflux disease

9. History of recurrent kidney stones

10. Obesity

Dr. Beard did not note any end-organ damage from diabetes or hypertension. Pulmonary

function testing revealed "very mild" restrictive disorder. There was only some mild tenderness of the abdomen. Examination revealed some moderate osteoarthritis in both knees with motion loss. Plaintiff ambulated with a right antalgic limp with knee pain. She had some difficulty with functional ambulatory testing.

May 5, 2004, pulmonary function testing indicated "very mild restrictive disease" (R. 521).

On May 26, 2004, State agency reviewing physician Cynthia Osborne, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") opining that Plaintiff could lift 20 pounds occasionally; 10 pounds frequently; could stand/walk 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday (R. 524). She could never climb ladders, ropes or scaffolds, and could only occasionally perform all other posturals. She had no manipulative, visual, or communicative limitations. She should avoid concentrated exposure to extreme cold and hazards.

On July 14, 2004, Plaintiff presented to Dr. Khan, who diagnosed a syncopal episode (R. 532).

On August 3, 2004, Dr. Khan diagnosed an upper respiratory infection, bronchitis, and uncontrolled Type II diabetes (R. 531).

On August 24, 2004, State agency reviewing physician Thomas Lauderman, D.O. completed an RFC opining that Plaintiff could lift 20 pounds occasionally; 10 pounds frequently; could stand/walk about 6 hours in an 8-hour workday; and could sit about 6 hours in an 8-hour workday (R. 549). She could never climb ladders, ropes or scaffolds and could do all other posturals only occasionally. She had no manipulative, visual, or communicative limitations. She should avoid concentrated exposure to extreme cold and heat and avoid even moderate exposure to hazards.

On September 7, 2004, Plaintiff followed up with Dr. Khan (R. 565). Dr. Khan diagnosed

Type II diabetes, hypertension, obesity with weight gain, and an upper respiratory tract infection.

On January 27, 2005, Plaintiff followed up with Dr. Khan, who diagnosed rosaceae, sinusitis, dyspnea, obesity with weight gain, Type II diabetes, and hypertension (R. 563).

On April 12, 2005, Plaintiff followed up with Dr. Khan, who diagnosed uncontrolled Type II diabetes, uncontrolled hypertension, obesity, and sinusitis and bronchitis (R. 562).

On April 14, 2005, Plaintiff followed up with Dr. Khan, who diagnosed uncontrolled Type II diabetes, uncontrolled hypertension, uncontrolled hyperlipidemia, and neuropathy.

On June 16, 2005, Plaintiff followed up with Dr. Khan (R. 560). Plaintiff complained of chest pain. Dr. Khan diagnosed chest pain, uncontrolled Type II diabetes, uncontrolled hypertension, uncontrolled hyperlipidemia, chest pain, neuropathy, and obesity. Dr. Khan instructed Plaintiff to go to the emergency room that same day for chest pain (R. 588). A preliminary report showed mild COPD (R. 596). Chest X-rays identified no acute cardiopulmonary disease (R. 597). Plaintiff was discharged that same day.

On August 11, 2005, Plaintiff followed up with Dr. Khan, who diagnosed uncontrolled Type II diabetes, hypoglycemia, uncontrolled hypertension, uncontrolled hyperlipidemia, vascular coronary artery disease ("CAD"), neuropathy, obesity, and depression/anxiety/stress (R. 559).

On September 21, 2005, Plaintiff followed up with Dr. Khan, who diagnosed uncontrolled Type II diabetes, hypoglycemia, uncontrolled hypertension, uncontrolled hyperlipidemia, vascular CAD, neuropathy, obesity, and depression/anxiety/stress (R. 558).

On November 5, 2005, Plaintiff presented to the emergency room with shortness of breath with severe wheezing (R. 612). She had fever and chills and productive cough. She did not improve with home or emergency room treatment. She was admitted to the hospital for more vigorous

treatment. Her provisional diagnosis was exacerbation of chronic obstructive pulmonary disease. She remained in the hospital for eight days, during which she improved. November 9, 2005, chest x-rays were normal (R. 572). She was discharged on November 13, 2005, with normal vital signs. She was instructed to follow a regular diet, activity as tolerated, Lasix, 40 mg. p.o. daily, Albuterol and Atrovent four times daily, Lotrel 5/20 p.o. daily, Byetta, 10 units subcutaneously twice a day, Vytorin 10/20 one tablet p.o. daily, Ceftin, 500, g. p.o. twice daily, Novolog Mix, 32 units subcutaneously q.p.m. and 42 units subcutaneously q.a.m, and Lorcet 10/650 four times daily. Her discharge diagnosis was acute exacerbation of bronchial asthma; hypertension; hyperlipidemia; diabetic neuropathy; diabetic mellitus, Type II, uncontrolled; esophageal reflux disease; hiatal hernia; and morbid obesity (R. 613).

Sometime near the end of 2005, Dr. Khan wrote a letter to Plaintiff's counsel, opining "with great certainty" that Plaintiff had been totally disabled from any type of work since July 31, 2002 (R. 569). He stated that as a result of her significant obesity and uncontrolled diabetes, she suffered significant fluid retention in her legs, largely uncontrolled high blood pressure, uncontrolled hyperlipidemia, neuropathy, nephropathy and signs of renal failure. He referred to this group of diseases as "metabolic syndrome," and also diagnosed her with asthma and, recently, COPD, longstanding osteoarthritis of her knees and irritable bowel syndrome. Dr. Khan stated that he and Plaintiff had worked very hard to control her diabetes, trying both oral medications and insulin, but had never been able to obtain full control. He referred her to Dr. Haq, a specialist, who recommended Lantus insulin and then Novolog insulin. The Lantus was not effective and she was using Novolog. Recent test results, however, still indicated her control was worsening. Her blood sugar was consistently high.

Dr. Khan then noted that with blood sugar levels such as Plaintiff's, she would experience an overall sick feeling, fatigue, blurred vision, headaches, thirst and frequent urination. His larger concern was heart disease. Plaintiff had often complained of chest pain and used nitroglycerine. A recent ECG showed sinus bradycardia and the possibility of anterior infarct. He opined that her kidneys had also been affected, with urinalysis results confirming nephropathy (which he described as a condition wherein the kidneys begin to leak proteins into the urine.) He also opined that she may have to consider dialysis in the near future.

Dr. Khan stated that Plaintiff was morbidly obese, at 5'4" and nearly 300 pounds. It was affecting her diabetic control and blood pressure control, as well as increasing her shortness of breath and pain in her arthritic knee joints. She had long suffered from asthmatic bronchitis "requiring the use of inhalers and a nebulizer machine. She required use of the nebulizer up to four times a day and she would have to be allowed to take this machine to work." Plaintiff had recently been seen in his office with significant breathing difficulties and was referred to the hospital, where she was admitted.

Dr. Khan said he believed Plaintiff had made a good faith effort to lose weight with limited success from time to time. He believed she followed her diet as needed for obesity and diabetes. He would have liked her to exercise more, but "walking is extremely limited by the condition of her knees."

Dr. Khan opined: "One of her most serious conditions throughout this time period is fluid retention. This has been a longstanding problem for her since 2002. She was taking a diuretic, Lasix, since 2002. Currently, she takes Lasix 40 mg two times per day and has done so for several years. This medication makes the patient frequently urinate. I would not find it unusual at all for a patient to urinate 20+ times in the time span of two to three hours. This may depend on how much

fluid the patient was retaining on a particular day, however, I would not find this unusual in Diane's case. I have also instructed her to elevate her legs in order to reduce swelling. She should do this at least once every couple of hours for about 30 minutes or more often if needed."

Dr. Khan concluded that overall, Plaintiff was unable to consistently perform any type of full time employment. He believed she would be limited to a couple of hours of standing or walking and minimal lifting. Any work would also have to allow her to have numerous bathroom breaks at her discretion due to fluid retention and IBS. She would also need breaks to set up her nebulizer each day, to check her blood sugar, and to take her insulin. She would need to be allowed to elevate her feet to at least waist level, and higher if possible. An employer would have to forgive frequent absences. When her blood sugar was high she would be very sick and leave or miss work altogether. He stated it was reasonable to believe this would happen at least two or three times a month.

On January 13, 2006, Frank Cuda, Nurse Practitioner, completed a physical exam for the State DHHR (R. 636). He noted Plaintiff was 5'4" and weighed 275 pounds. Her blood pressure was 140/80. Her posture was ok, but her gait was "slow and waddling." It was noted that she had multiple missing teeth, and that her knees were swollen. The diagnosis was diabetes-out of control; pancreatitis; and severe osteoarthritis of the knees. Mr. Cuda opined that Plaintiff could not work full time at any occupation because she could not bear weight; her beet burned and her eyes blurred with glucose of above 300, and she had near-monthly bronchitis.

### III. Administrative Law Judge Decision

The ALJ made the following findings:

1.      The claimant last met the insured status requirements of the Social Security
        Act on December 31, 2005.

2.      The claimant has not engaged in substantial gainful activity at any time

17

relevant to this decision, i.e., after October 24, 2003 (20 CFR §404.1520(b) and 404.1571 et seq.

3.      Through the date last insured, the claimant had the following severe combination of impairments: diabetes; asthma; possible sleep apnea; history of recurrent kidney stones with infection; osteoarthritis of the knees with a history of right leg injury with multiple procedures on the right knee and one on the left; hypertension with headaches; obesity; mild right carpal tunnel; history of right shoulder bursitis; bilateral trochanteric bursitis; history of pancreatitis and liver inflamation with possible stable gall stone pancreatitis; history of hysterectomy, cholecystectomy, and pancreatitis with removal to two stones of the pancreas; history of atypical chest pain; history of procedures including appendectomy, benign tumor removal, tonsillectomy, and lithotripsy for kidney stones; history of irritable bowel syndrome; history of GERD and hiatal hernia; history of allergies; history of hyperlipidemia and high cholesterol; (20 CFR § 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520(d), 404.1525 and 404.1526)).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work with no climbing of ladders, ropes, scaffolds, stairs or ramps; with no exposure to temperature extremes; no exposure to significant work place hazards like heights or dangerous moving machinery; with no exposure to extremes of fumes, dusts, gases, other respiratory irritants; with the ability to check blood sugars and eat small sacks [sic] at work site up to 2 times per day for a few minutes each in addition to normal breaks; with no walking or standing more than 15 minutes at a stretch; with no walking or standing more than 4 hours total in a work day; with the ability to use the restroom on an unscheduled basis once each in the AM and PM for a brief period in addition to normal breaks; and with the ability to miss up to one day of work per month. (SSR 96-5p).

6.      Through the date last insured, the claimant's past relevant work as a secretary in the recorder's office did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR § 404.1565).

7.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through December 31, 2005, the date last insured (20 CFR § 404.1520(f)).

(R. 364-380).

# IV. Contentions

Plaintiff contends:

A.     The ALJ erred because he failed to find that Ms. Ogden's bilateral knee osteoarthritis met listing 1.02A;

B.     The ALJ erred because he erroneously cited to the record numerous times, thus, mischaracterizing the true severity of Ms. Ogden's impairments:

      1. Weight Loss;
      2. Uncontrolled blood sugar;
      3. Kidneys;
      4. Asthma; and
      5. Fluid retention;

C.     The ALJ erred because he improperly rejected the treating physician's opinion, and every other opinion favorable to Ms. Ogden while improperly accepting the State agency opinions;

D.     The ALJ erred because he failed to include any limitations in the RFC or in the hypothetical questions to the VE related to Fluid retention.

Defendant contends:

A.     Plaintiff's knee impairment did not satisfy the requirements of Listing 1.02A;

B.     The ALJ correctly considered the evidence of record when determining Plaintiff's RFC;

C.     The ALJ correctly declined to give controlling weight to Dr. Khan's undated letter; and

D.     The ALJ properly rejected the extreme limitations in Dr. Khan's undated letter submitted to Plaintiff's attorney;

# V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.

1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987).

### B. Knee Impairments

Plaintiff first argues that the ALJ erred because he failed to find that her bilateral knee

osteoarthritis met Listing 1.02A. Defendant argues that Plaintiff's knee impairment did not satisfy

the requirements of Listing 1.02A. 1.02A provides, in pertinent part:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion or
> other abnormal motion of the affected joint(s), and findings on appropriate medically
> acceptable imaging of joint space narrowing, bony destruction or ankylosis of the
> affect joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

1.00B2b provides:

*What We mean by Inability to Ambulate Effectively*

(1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk: *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities, Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such a shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive device does not, in an d of itself, constitute effective ambulation.

Plaintiff cites <u>Cook v. Heckler</u> in support of her argument that the ALJ improperly failed to consider and discuss whether her medical conditions met or equaled a listing. 782 F.2d 1168, 1172 (4th Cir. 1986). In <u>Cook</u>, the Fourth Circuit noted that the Secretary in that case found that the claimant suffered from arthritic pain in her hips and knees, which made walking difficult, as well as in her shoulders, wrists, and fingers . . . . However, her "neurological status" and gait were normal. The Secretary concluded that, while her arthritis constituted a "severe" impairment, it did not match or equal any impairment listed in 20 CFR § 404. Subpart P, Appendix 1. <u>Id.</u> The Fourth Circuit then noted:

On the other hand, there is ample evidence in the record to support a determination that Cook's arthritis met or equaled one of the arthritic impairments listed in Appendix 1, Section 1.01. For example, Sections 1.02, 1.03, and 1.04 all require a history of joint pain. Cook had a history of pain in her hip, knee, and shoulder joints. Section 1.02 lists an elevated sedimentation rate as one of three alternative requirements; Cook's sedimentation rate was 5 mm/hr, which may or may not be "elevated." X-rays demonstrated "degenerative changes" and joint space narrowing in the hips and shoulders. There was also significant limitation of motion. Section 1.04 requires "abduction" of the shoulders to be less than 90 degrees; Cook's

shoulder abduction was reduced to 70 degrees in one shoulder and 50 degrees in the other. Flexion of each hip was reduced to 30 degrees, and flexion of the knee joints was also reduced, although the exact number on the medical chart is illegible. The symptoms appear to correspond to some or all of the requirements of sections 1.02, 1.03, and 1.04.

As in Cook, Plaintiff's symptoms in this case "appear to correspond to some or all of the requirements of Listing 1.02A. There is evidence of instability of the knees, chronic knee pain and stiffness with signs of limitation of motion, and findings on appropriate medically acceptable imaging of joint space narrowing. Plaintiff therefore appears to at least meet the threshold of the Listing. Her knee impairment also by definition involves a major peripheral weight-bearing joint.

Defendant argues, however, that Plaintiff does not meet the listing because she did not have an inability to ambulate effectively as required. Plaintiff argues that the ALJ erred by making a blanket finding that she did not meet any of the listings, without offering any discussion as to how the specific facts did not meet the required elements of Listing 1.02(A).

The undersigned United States Magistrate Judge has generally found that the ALJ has erred if he or she does not identify the relevant listed impairments and then compare each of the listed criteria to the evidence of the plaintiff's symptoms. See Cook, supra. "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." Id. In this case, the ALJ did not clearly list each relevant listing and then compare Plaintiff's symptoms to each one. The undersigned finds the ALJ did, however, when discussing the Listings at Step Three, expressly discuss Plaintiff's knee impairments in conjunction with her other impairments such as obesity. He noted her history of seven surgeries on the right knee and one on the left. He noted her knee x-rays showing median joint space narrowing with varus alignment, bilateral trochanteric bursitis, and osteoarthritis of both knees. He also noted Dr. Beard's

22

description of Plaintiff's gait as "waddling" in 2006, along with the lack of any mention of a knee brace or assistive device for ambulation; Dr. Beard's earlier observation that Plaintiff favored her right leg and exhibited some difficulty with heel toe and tandem walking due to right knee pain, but with adequate function for getting about unaided; no requirement of an assistive device in 2004 for ambulation; Dr. Beard's finding that Plaintiff had an antalgic limp with knee pain, and the specialist Dr. Topping's omission of any limp.

Besides the above signs and findings, the ALJ also expressly noted that Plaintiff used a knee brace but was able to ambulate and stand without the use of an assistive device.

The undersigned finds the ALJ did address Listing 1.02A and compared Plaintiff's symptoms to the requirements of that listing, although not in the most clear manner. The undersigned further finds that substantial evidence supports the ALJ's determination that Plaintiff does not meet or equal Listing 1.02A, as she does not demonstrate an inability to ambulate effectively, as defined in 1.00B2b.

### C. Alleged mischaracterization of impairments

Plaintiff next argues that the ALJ erred because he erroneously cited to the record numerous times, thus mischaracterizing the true severity of her impairments. She particularly argues that the ALJ mischaracterized evidence regarding weight loss; uncontrolled blood sugar; kidneys; asthma; and fluid retention. Defendant contends that the ALJ correctly considered the evidence of record when determining Plaintiff's RFC.

Regarding weight loss and uncontrolled blood sugar, the ALJ states in different parts of the Decision: "The record indicates that the claimant could generally be expected to be less symptomatic with weight loss, and that is especially considering her prior knee injuries and that with improved

23

diet that she could have better sugar control given the diet restrictions emphasized to her by a treating provider" (R. 367). He later notes: "Dr. Topping's orthopedic notes indicate that the claimant's weight has been contributing to her knee symptoms" (R. 369). Later: "There are notations at times addressing uncontrolled type II diabetes. Nonetheless, there are also indications that the condition has diet compliance issues and that she does not always closely monitor and treat her diabetes with insulin. With regard to compliance issues, I note that she has mentioned that she does not always take medication because she cannot afford it and she enjoys fried foods, sweets and carbohydrates despite being warned about her diet. Thus, I am not convinced that the claimant's sugar levels cannot be controlled better." Further: "The claimant is overweight, but the condition has not generally been considered to be a material matter in the medical evidence other than being a negative issue considering her other impairments as further discussed herein." "Although the obesity is not demonstrated to be severe alone, she has been described as moderately and morbidly obese and that obesity is noted as a negative factor regarding her diabetes and her orthopedic issues. . . The obesity in conjunction with the claimant's diabetes and osteoarthritis of the knees, present the most prominent of impairments with the knees and obesity being the most collectively limiting of all for this claimant insofar as her ability to perform basic work activity, as underscored by Dr. Beard's clinical impression. Dr. Khan, a treating provider has essentially suggested that the claimant is disabled due to a combination of obesity and diabetes that he suggested had resulted in a metabolic disorder . . . suggesting positive correlation between the diabetes and weight. However, I do not find that either or all of the suggested combinations or even all of the step two impairments and obesity have longitudinally resulted in any Listing equivalency."

First, the undersigned finds the above-quoted statements inconsistent with each other and the

decision as a whole. The ALJ appears to find that most if not all of Plaintiff's impairments would be better if she lost weight. On the other hand, he finds her morbid obesity non-severe. Finally, he states that her obesity in conjunction with her diabetes and osteoarthritis of the knees, present the most prominent of impairments <u>with the knees and obesity being the most collectively limiting of all for this claimant insofar as her ability to perform basic work activity</u>. (Emphasis added). It is difficult for the undersigned to reconcile this finding with the express finding that Plaintiff's obesity alone is a non-severe impairment. To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." The Fourth Circuit holds that "an impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984) (Emphasis in original). It is difficult to imagine that Plaintiff's weight, ranging from 270 to 300, on her 5'4" frame, would not be more than a slight abnormality, especially where the ALJ found her "waddling gait" was "not surprising given her weight at 274 pounds."

More importantly, however, the ALJ opines that Plaintiff's impairments, at least her diabetes, would be better, if not perhaps cured, if she lost weight and/or was compliant with her diet. This may very well be true. Dr. Topping counseled Plaintiff on the benefits of weight loss, even explaining the option of referring her for gastric stapling. Plaintiff's long-time treating physician, Dr. Khan, however, stated that he believed Plaintiff had made a good faith effort to lose weight with

limited success from time to time. He believed she followed her diet as needed for obesity and diabetes. He would have liked her to exercise more, but "walking is extremely limited by the condition of her knees." He also stated that he and Plaintiff had worked very hard to control her diabetes, trying both oral medications and insulin, but had never been able to obtain full control. He had referred her to Dr. Haq, a diabetic and endocrine specialist, who recommended Lantus insulin and then Novolog insulin, and adding that the Lantus was not effective and she was using Novolog. Recent test results, however, indicated her control was still worsening and her blood sugar was consistently high.

Even if Plaintiff would be better off or even cured of some of her impairments if she lost weight, Social Security Regulation ("SSR") 02-1p explains the evaluation of failure to follow prescribed treatment in obesity cases as follows:

> Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s). Our regulations at 20 CFR 404.1530 and 416.930 provide that, in order to get benefits, an individual must follow treatment prescribed by his or her physician if the treatment can restore the ability to work, unless the individual has an acceptable reason for failing to follow the prescribed treatment. We will rarely use "failure to follow prescribed treatment" for obesity to deny or cease benefits.

> SSR 82-59, "Titles II and XVI: Failure To Follow Prescribed Treatment," explains that we will find failure to follow prescribed treatment only when all of the following conditions exist:
>> The individual has an impairment(s) that meets the definition of disability, including the duration requirement, and
>> A treating source has prescribed treatment that is clearly expected to restore the ability to engage in substantial gainful activity, and
>> The evidence shows that the individual has failed to follow prescribed treatment without a good reason.
>> If an individual who is disabled because of obesity (alone or in combination with another impairment(s)) does not have a treating source who has

26

prescribed treatment for the obesity, there is no issue of failure to follow prescribed treatment.

The treatment must be prescribed by a treating source, as defined in our regulations at 20 CFR 404.1502 and 416.902, not simply recommended. A treating source's statement that an individual "should" lose weight or has "been advised" to get more exercise is not prescribed treatment.

When a treating source has prescribed treatment for obesity, the treatment must clearly be expected to improve the impairment to the extent that the person will not be disabled. As noted in question 13, the goals of treatment for obesity are generally modest, and treatment is often ineffective. Therefore, we will not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful. The obesity must be expected to improve to the point at which the individual would not meet our definition of disability, considering not only the obesity, but any other impairment(s).

Finally, even if we find that a treating source has prescribed treatment for obesity, that the treatment is clearly expected to restore the ability to engage in SGA, and that the individual is not following the prescribed treatment, we must still consider whether the individual has a good reason for doing so. In making this finding, we will follow the guidance in our regulations and SSR 82-59, which provide that acceptable justifications for failing to follow prescribed treatment include, but are not limited to, the following:

The specific medical treatment is contrary to the teaching and tenets of the individual's religion.

The individual is unable to afford prescribed treatment that he or she is willing to accept, but for which free community resources are unavailable.

The treatment carries a high degree of risk because of the enormity or unusual nature of the procedure.

In this regard, most health insurance plans and Medicare do not defray the expense of treatment for obesity. Thus, an individual who might benefit from behavioral or drug therapy might not be able to afford it. Also, because not enough is known about the long-term effects of medications used to treat obesity, some people may be reluctant to use them due to the potential risk.

Because of the risks and potential side effects of surgery for obesity, we will not find that an individual has failed to follow prescribed treatment for obesity when the prescribed treatment is surgery.

The ALJ did not find Plaintiff was disabled. He was therefore not permitted to make any failure to follow prescribed treatment for obesity an issue in this case. The record clearly shows that

Plaintiff had uncontrolled diabetes. The record also shows that her uncontrolled diabetes may have damaged her kidneys and liver. Due to her liver dysfunction, she was precluded from taking certain medications, including Glucophage, which, ironically, may have helped her blood sugar. What the record does not clearly show, however, is what the ALJ opined: "Basically, the claimant's diabetic condition can be controlled with medication and diet . . . ." In fact, Plaintiff's treating physician stated that it could not.

The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff's diabetic condition could be controlled with medication and diet. Substantial evidence also does not support his finding that she "has uncontrolled blood sugar reported at times." (Emphasis added). Plaintiff was diagnosed with uncontrolled diabetes on November 14 and December 8, 2003; April 19 and August 3, 2004; April 12, April 14, June 16, August 11, September 21, and (during a hospitalization) on November 5, 2005. According to Plaintiff 's treating physician, her blood sugar was "consistently high" despite treatment and compliance with diet. but It follows that substantial evidence does not support the ALJ's statement that "the claimant has not demonstrated much the matter other than often not controlling her sugar optimally." (Emphasis added). While the record does not indicate what functional limitations may be caused by Plaintiff's uncontrolled blood sugar, there is evidence that it has caused kidney dysfunction that could lead to dialysis, as well as fatty infiltration of the liver, suspected to be "caused by uncontrolled diabetes."

Regarding Plaintiff's asthma, the undersigned finds there is a factual error in the ALJ's decision which concerns Plaintiff's need for a nebulizer. This will be discussed later in regards to Dr. Khan's opinion. On the whole, however, the undersigned finds the record does substantially

support the ALJ's determination regarding the limitations caused by Plaintiff's asthma. It is true that Plaintiff was treated in the hospital for exacerbations of asthma three times in approximately 27 months. Plaintiff herself testified on February 27, 2006, however, that she only used her nebulizer two or three days after she was discharged from the hospital in November 2005 (R. 698). She did use her inhalers, but only two or three times a week (R. 667). She testified that her breathing problems intensified if she got upset or walked a lot, or caught a cold. The ALJ also noted pulmonary function testing which showed only mild restrictive disease. He limited her to light work with no climbing of ladders, ropes, scaffolds, stairs or ramps, no exposure to temperature extremes, no exposure to extremes of fumes, dusts, gases or other respiratory irritants, and with no walking or standing more than 15 minutes at a time or four hours total in an eight-hour workday. The undersigned finds the evidence substantially supports the ALJ's determination that Plaintiff's asthma was not disabling, and the limitations which were, at least in part, to account for her breathing condition.

Plaintiff argues that the ALJ also mischaracterized the severity of her fluid retention. The ALJ noted that Plaintiff "continued to allege lower extremity edema and some excessive urinary frequency with Lasix. Even so, the edema and the excessive urination have not been demonstrated durationally to the degree and frequency she has alleged. The claimant reported a period of increased urination and I note that there was actually a significant concern for her kidney function around that time, when she was further specifically advised on the importance of compliance with a proper diet.

The ALJ later found:

Also, I note that the above stated limitations are basically the same as the previous decision without significant change except that I have reduced the number of

29

bathroom breaks some because I do not credit the extreme claims of using the bathroom 15 to 20 times in the first two or three hours per day after lasix medication. The amount of breaks alleged by the claimant would amount to nearly half of her time in the restroom, which is not realistic even with lasix . . . .

The ALJ also discredited treating physician Dr. Khan's opinion regarding the frequent use of the bathroom as follows:

In addition to the opinion issued after the expiration of the claimant's date last insured. . . , there is an undated opinion by Dr. Khan suggesting that the claimant has so many limitations that she cannot be expected to work at a normal job . . . . Per Dr. Khan, the claimant has taken as much as six 40 mg tablets of Lasix resulting in frequent urination such that it would not be unusual to urinate more than 20 times in the span of 2 to 3 hours. Also, per Dr. Khan, the claimant has been told to keep her legs elevated in order to reduce swelling once every couple of hours for 30 minutes or more often if she need too [sic]. Thus, his opinion is that the claimant could not work due to limits on walking and standing, lifting and due to the need for bathroom breaks related to the irritable bowl [sic], sugar checks and snacks and elevating her feet and to miss work two or three times a month due to elevated sugar.

Dr. Khan's report of disability is overstated in contrast with the longitudinal medical evidence. I note that the prescribed amount of Lasix or Furosemide is 40 mg two times daily for fluid and high blood pressure and that this has been prescribed for 26 years per the claimant's own report . . . . Dr. Khan states that claimant was taking 40 mg 6 times per day which suggests a temporary increase in dosage at the time Dr. Khan issued his opinion or possibly even an abuse of the prescription by the claimant as opposed to a chronic problem requiring a sustained and high prescribed dosage of six times a day dosage [sic]. The usual adult dosage appears to be 20 to 80 milligrams per day consistent with the stated prescription. . . as opposed to the high dosage reported by Dr. Khan (See THE PILL BOOK, 11th Ed., Page 647).

(Emphasis added). The undersigned notes that the "undated' letter is obviously written around the middle of November 2005, because Dr. Khan references Plaintiff's recent office visit for significant breathing difficulties, after which she was immediately referred to Davis Memorial Hospital (R. 569). This admission took place on November 5, 2005.

The most significant problem with the ALJ's handling of Dr. Khan's opinion letter is that the ALJ takes issue with Dr. Khan's alleged statement that Plaintiff "was taking 40 mg 6 times per day"

of Lasix, when the usual adult dosage appears to be 20 to 80 milligrams per day. The problem is that Dr. Khan never said Plaintiff was taking 40 mg. of Lasix six times per day. This is an absolute error. Dr. Khan specifically states:

> One of her most serious conditions throughout the time period is fluid retention. This has been a longstanding problem for her since 2002. She was taking a diuretic, Lasix, since 2002. Currently, she takes Lasix 40 mg two times per day and has done so for several years. This medication makes the patient frequently urinate. It would not be unusual at all for a patient to urinate 20+ times in the time span of two to three hours. This may depend on how much flue the patient was retaining on an a particular day, however. I would not find this unusual in Diane's case.

In fact, the amount of Lasix Plaintiff was taking, as stated by Dr. Khan, was well within the normal dosage: "Currently, she takes Lasix 40 mg two times per day and has done so for several years" (R. 570). The very report quoted by the ALJ stated that Plaintiff was taking Lasix 40 mg two times per day, not Lasix 40 mg six times per day. (Further, although Plaintiff was not taking more than 80 mg per day, it is interesting to noted that up to 600 mg can be prescribed per day. PHYSICIAN'S DESK REFERENCE, 2174(62nd ed. 2008)). The undersigned could have found this simple error of fact harmless, except the ALJ bases much of his findings regarding both Plaintiff's and Dr. Khan's credibility on it. The first sentence of the paragraph referencing the Lasix states: "Dr. Khan's report of disability is overstated in contrast with the longitudinal medical evidence." The entire remainder of that paragraph discusses the "temporary increase in dosage at the time Dr. Khan issued his opinion or possibly even an abuse of the prescription by the claimant . . . ." (Emphasis added).

The ALJ includes in his hypothetical that Plaintiff must be able to use the restroom on an unscheduled basis once each in the AM and once in the PM for a brief period in addition to normal breaks (R. 373). Based on the ALJ's mistake in fact, the undersigned cannot find that substantial

evidence supports this limitation. There is absolutely no evidence in the record refuting Plaintiff's claim of needing to use the bathroom 20-30 times after taking her diuretic, and her treating physician corroborates that claim. The ALJ seems to simply have picked the extra one time in the morning and one time in the afternoon, without any support for that limitation. In fact, in the prior decision, he allowed for one unscheduled bathroom break <u>per hour</u>, but in the present decision decreased even that limitation.

The undersigned further notes the following exchange between the ALJ and Plaintiff:

ALJ: How often do you use the bathroom when you take the Lasix?

A: It's a lot. The - - well, not every day. I'm not going to tell you it's a lot every day. Some days it's not uncommon to go to the bathroom 15, 20 times. And then other days, maybe 15 times within 3 hours, 3 to 4 hours. But I've noticed - -

ALJ: Well, what makes for, what makes for one day or another?

A: I don't know. It's just, like, one day I have more fluid in my body than I do others. And I've noticed when there's a lot of fluid, it makes it harder to breathe, too. It affects my breathing.

ALJ: Anything cause the fluid buildup? I mean, do you drink a lot of water or - -

A: Yes, I do. I keep water - -

ALJ: Well, why do you drink a lot of water? What - -

A: I stay thirsty.

ALJ: You might be better off - - have you ever tried not drinking water?

A: Yeah.

ALJ: Well, what happened?

> A:    My mouth stays dry.  I dry out.  And the doctors suggest I drink a lot of water
>
> because of the kidneys, to keep them flushed.

(R. 681-682).  If the ALJ had felt the need for a medical expert to explain the function of a diuretic

or the necessity for a diabetic with kidney problems to drink water, he certainly could have retained

one.  On the other hand, he could have asked Plaintiff's own treating physician, Dr. Khan, why

Plaintiff was retaining fluid, why she was drinking water, and how the diuretic worked.  He did not.

Upon consideration of all of the above, the undersigned finds substantial evidence does not

support the ALJ's findings regarding Plaintiff's fluid retention or her need for frequent bathroom

breaks.

The same is true about the ALJ's discussion of Plaintiff's use of a nebulizer.  The ALJ again

mischaracterized Dr. Khan's statement, saying:

> Overall, Dr. Khan's opinion cannot be credited reasonably because it is not consistent
> with the claimant's testimony and other findings of record.  For instance, he states
> that the claimant must have time to set up the Nebulizer four times a day and then use
> it.  However, the claimant testified that she has only used her Nebulizer on two days
> since November 2005.

(R. 379).  Plaintiff herself did testify on February 27, 2006, that she only used her nebulizer for two

or three days after she was discharged from the hospital two months earlier (R. 698).  She was told

at the time to use it two to four times a day because of her bronchitis.  Dr. Khan wrote the letter

during about that same period of time, stating that Plaintiff had long suffered from asthmatic

bronchitis requiring the use of inhalers and a nebulizer machine.  Therefore, Dr. Khan's opinion was

absolutely correct at that time, two months before the hearing.  Further, Dr. Khan stated only that

Plaintiff required the use of the nebulizer <u>up to</u> four times a day, and  <u>would have to be allowed to</u>

<u>take it to work</u>.  He did not state, as the ALJ says, that "she must have time to set up the Nebulizer

33

four times a day and then use it." The difference may not seem so important, except, again, it reflects on both Plaintiff's and her treating physician's credibility.

### D. Treating physician opinion

Plaintiff next argues that the ALJ erred because he improperly rejected the treating physician's opinion, and every other opinion favorable to Ms. Ogden while improperly accepting the State agency opinions. Defendant contends that the ALJ correctly declined to give controlling weight to Dr. Khan's undated letter.

There can be no dispute that Dr. Khan is Plaintiff's treating physician. 20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the

treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The Fourth Circuit additionally holds: "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."

Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

Here the ALJ found Dr. Khan's report "overstated" in contrast with the longitudinal medical evidence, meaning it was not supported by the evidence or not consistent with the record as a whole. This finding was based in large part on the ALJ's error regarding the dosage of Lasix Plaintiff was taking, as noted above, and the doctor's comment regarding the use of a nebulizer, which was also discussed above. The undersigned finds these errors adversely and improperly affected the weight accorded Dr. Khan's opinion.

Additionally, the ALJ accorded great weight to and "basically relied on" the opinions of the State reviewing physicians, while according basically no weight to Dr. Khan's opinion. Social Security Ruling ("SSR") 96-6p provides:

> At the administrative law judge and Appeals Council levels, RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s). Again, they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence.

Also

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

That circumstance does not exist in the present case. In fact, the two State reviewing physicians' opinions were submitted in May and August of 2004, whereas Dr. Khan's opinion was submitted

36

in November 2005, the hearing was held in February 2006, and the decision was entered on April 17, 2006 (R. 523, 548). State reviewing physician Dr. Lauderman bases his RFC on a primary diagnosis of osteoarthritis of the knees and a secondary diagnosis of obesity (R. 548). He does not mention diabetes, high blood pressure, fluid retention, or COPD, and where asked if a treating or examining source statement was in the file, he refers only to the prior ALJ decision. The same is true of the earlier RFC, with the exception that that reviewing physician at least mentioned diabetic neuropathy, asthma, high blood pressure, and liver problems as well as osteoarthritis of the knees and morbid obesity.

The ALJ in this case based his according of greater weight to the State reviewing physicians' opinions mostly on his erroneous interpretation of Dr. Khan's opinion. The undersigned therefore finds substantial evidence does not support the ALJ's rejection of Dr. Khan's opinion or his according great weight to and "basically relying on" the State agency reviewing physicians' opinions.

### E. Fluid Retention

Plaintiff finally argues that the ALJ erred because he failed to include any limitations in the RFC or in the hypothetical questions to the VE related to fluid retention. Defendant contends that the ALJ properly rejected the extreme limitations in Dr. Khan's undated letter submitted to Plaintiff's attorney. The undersigned has already found that substantial evidence does not support the ALJ's rejection of Plaintiff's alleged need to use the bathroom frequently or his hypothetical "allowing" for one unscheduled bathroom break in the am and one in the pm.

In addition, the ALJ rejected Dr. Khan's requirement that Plaintiff be permitted to elevate her legs at least once every couple of hours for about 30 minutes or more often if needed to reduce swelling. The ALJ states that the medical exams of record do not typically find any leg swelling,

edema or fluid retention, citing to Exhibits B5F and B14 F. B5F is the exam by Dr. Beard for the State agency (R. 514). In his examination, Dr. Beard does, however, find "some trace lower extremity edema." Significantly, Dr. Beard also found trace bilateral lower extremity edema during his previous exam of Plaintiff for the State agency in 2002 (R. 156). B14F contains the progress notes from Plaintiff's November 2005 hospital admission for bronchitis/exacerbation of chronic asthma. It is true that on page 11 of the progress notes is a notation that her extremities had no edema, but Plaintiff had, at that time, been in the hospital for some four days. On the other hand, Dr. Khan reported edema during office visits going as far back as May 2003 (R. 213. 215). He then noted edema nearly continuously on August 11, September 21, October 27, November 4, November 9, and November 18, 2005. Notably, these latter reports were all more than a year after the two State agency physician reports upon which the ALJ relied were submitted.

The undersigned finds the ALJ does not cite any real evidence inconsistent with Dr. Khan's continual findings of edema, and therefore his instruction that she elevate her legs. The undersigned therefore finds substantial evidence does not support the ALJ's rejection of either frequent bathroom breaks or leg elevation in his RFC and hypothetical to the VE.

For all the above reasons the undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time prior to her date last insured of December 31, 2005.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [D.E..14] be **DENIED**, and Plaintiff's Motion for

Summary Judgment [D.E.11 be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *5* day of January 2009.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE